LAW OFFICE OF

# MICHAEL K. BACHRACH

276 FIFTH AVENUE, SUITE 501
NEW YORK, N.Y. 10001
--------------
TEL. (212) 929-0592 · FAX. (866) 328-1630

MICHAEL K. BACHRACH *
* admitted in N.Y., MN and D.C.

http://www.mbachlaw.com
michael@mbachlaw.com

May 5, 2017

By ECF

The Hon. Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*Re: United States v. Bryant Neal Vinas,*
*08 Cr. 823 (NGG)*

## DEFENDANT'S SENTENCING MEMORANDUM

Dear Judge Garaufis:

We represent Defendant Bryant Neal Vinas and write in advance of sentencing to seek a sentence that is fair and just, sufficient, but not greater than necessary to serve the purposes of sentencing. We acknowledge at the outset that the determination of the appropriate sentence in this case is a daunting task for all parties concerned. Mr. Vinas was, during the darkest period of his life, a terrorist. However, we can proudly state that Mr. Vinas took the worst experience in his life and turned himself into one of America's greatest weapons against al-Qaeda. Stated simply, he saved lives, and he helped the United States government substantially dismantle what had been the greatest threat to our nation and to our Western allies. As such, we write to respectfully request a sentence of "time served", which equals a sentence of approximately ten years.

## I.        Charge and Conviction

On January 28, 2009, Mr. Vinas pleaded guilty before this Court to all three counts of a three-count Superseding Information. Count 1 charged Mr. Vinas with conspiracy to murder United States nationals in violation of 18 U.S.C. § 2332(b)(2), Count 2 charged Mr. Vinas with providing material support to a foreign terrorist organization in violation of 18 U.S.C. §§ 2339B(a)(1), 2339B(d)(1)(A), and Count 3 charged him with receiving military-type training from a foreign terrorist organization in violation of 18 U.S.C. §§ 2339D(a), 2339D(b)(1).

Stated succinctly, Mr. Vinas was convicted of joining al-Qaeda. He faces a maximum sentence of life under Count 1, 15 years under Count 2, and 10 years under Count 3. There is, however, no mandatory minimum sentence in this case, and, as this Court is aware, Mr. Vinas's story does not end with him joining al-Qaeda. To the contrary, in many ways joining al-Qaeda is

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 2 of 9

merely a preamble to the events that followed – extraordinary events that warrant a sentence of "time served".  While Mr. Vinas's crimes cannot be forgiven, the unparalleled assistance he provided to the United States government after his arrest are indicative of a complex individual now on the path to redemption.

## II.      Sentencing Framework, Guidelines, and the Parsimony Clause

As is now well known, in Kimbrough v. United States, 128 S.Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in United States v. Booker, 534 U.S. 220 (2005), which requires District Courts to view the Guidelines as merely advisory, and instructs District Courts to tailor a sentence in light of all of the statutory concerns set forth in 18 U.S.C. § 3553(a).  Under 18 U.S.C. § 3553(a), District Courts are directed to impose the minimally-sufficient sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation – by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  See Kimbrough, 128 S.Ct. at 570.  This "parsimony provision" is "an overarching provision," representing a cap above which a District Court is statutorily prohibited from sentencing above, even when a greater sentence is recommended by the advisory Sentencing Guidelines.  To put it another way, pursuant to 18 U.S.C. § 3553(a), the Guidelines are to be viewed as statutorily subordinate to the parsimony clause.  See Kimbrough, 128 S.Ct. at 570; see also United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher").

Similarly, other statutory provisions also give the District Court direction in sentencing.  Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: In determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the court is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added).  Further, under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).

We do not dispute the Probation Department's Guideline calculations, and as such we agree with the Government that the "starting point" in determining Mr. Vinas's sentence is a Guideline range of 360 months to life.  That Guideline range, however, does not take into account Mr. Vinas's extraordinary and unparalleled assistance, nor the related fact that the Government has submitted multiple, overwhelming, 5K1.1 letters to this Court: one unclassified and publicly filed with redactions, one unclassified but filed ex parte and under seal, and one classified submission that provides this Court will all of the justification this Court needs to sentence Mr. Vinas as far below his advisory Guideline range as this Court deems appropriate.

Indeed, the "starting point" under the Guidelines does not take into account the extraordinary nature of Mr. Vinas's assistance – not merely to the United States Attorney's Office, but also to the intelligence community, our military, and our allies.  As such, this case, likely more

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 3 of 9

than any other case previously before this Court, is a prime example of where the parsimony clause of Section 3553(a) is what most appropriately drives Mr. Vinas's sentence, not the generic Guideline range.

**III.    The nature and circumstances of the offense and the history and characteristics of the defendant.**

The Government states in its 5K1.1 letter, "To say that the defendant provided substantial assistance to the government is an understatement.  Indeed, he may have been the single most valuable cooperating witness available to the government and law enforcement agencies with respect to al-Qaeda and associated topics related to the time period in which Vinas travelled to and was operational in Afghanistan and Pakistan between 2007 and 2008" (Gov't 5K1.1 letter, dated, February 3, 2017, at 6).[1]  Take that in context and one can quickly surmise why the Government does not dispute our belief that, "Given what we know about the last decade and what is [we] think a well-known fact that al-Qaeda's operational capability has been severely diminished over the last ten years … Mr. Vinas was the proximate cause of that diminished operational capability" (Transcript, dated, April 20, 2017, at 9-10).

Just days after the 2008 Presidential election, Mr. Vinas was arrested on November 11, 2008, by Pakistani officials.  While Mr. Vinas initially resisted the questioning of the Pakistani officials, "[h]e was ultimately subdued" (Gov't 5K1.1 letter at 6 n.6), and began answering questions from that point forward.  How Mr. Vinas was "subdued" is a question the Government does not address in its 5K1.1 letter, but one can assume it was done *less gently* than would have been required had he been in United States custody at the time.

On November 21, 2008, *twenty days later*, Mr. Vinas was transferred to United States custody and extradited for prosecution in a United States court.  Mr. Vinas was arraigned before Your Honor on November 22, 2008, in a proceeding where nearly every person in the courtroom (except Your Honor) was outfitted with bullet-proof vests.  On January 28, 2009, just eight days after Barak Obama was sworn in as our nation's 44th President, Mr. Vinas pleaded guilty pursuant to a cooperation agreement, thus formalizing for purposes of domestic law Mr. Vinas's agreement to assist the United States in its war on terror.

Domestically, Mr. Vinas provided the Government with "critical information relating to domestic threats and al-Qaeda external operations planning against the United States" (Gov't 5K1.1 letter at 7).  Mr. Vinas provided substantial assistance with the Government's prosecution of those involved in the plot to blow up the Long Island Rail Road, as well as other individuals residing in New York City and Long Island.  See Gov't 5K1.1 letter at 6-7.

---

[1]    In order to ensure compliance with this Court's Order, dated, March 24, 2017 (Doc. No. 49), which denied a request to unseal the entirety of the Government's 5K1.1 letter but permit the unsealing of a heavily-redacted version of that letter, all quotations herein are taken from the publicly available portions of the Government's submission.  We ask, however, that when this Court reviews the quoted statements this Court does so from the sealed and fully unredacted version.

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 4 of 9

In addition, Mr. Vinas "directly contributed to the prosecution of numerous individuals by the U.S. government" (Gov't 5K1.1 letter at 13), and provided "powerful and compelling" testimony leading to the conviction, on all counts, of Adis Medunjanin, "[a] man who was convicted" in 2012 "of plotting with two friends to carry out a coordinated suicide attack on New York City subways." Mosi Secret, *Man Convicted of a Terrorist Plot to Bomb Subways Is Sent to Prison for Life*, NY Times (November 16, 2012) (available at <http://www.nytimes.com/2012/11/17/nyregion/adis-medunjanin-convicted-of-subway-bomb-plot-gets-life-sentence.html>) (last accessed, April 30, 2017).

However, it was the information that Mr. Vinas provided the United States government about al-Qaeda and its global operations that, in the Government's own words, "provided unparalleled insight into the internal and external operations of al-Qaeda" (Gov't 5K1.1 letter at 8). Mr. Vinas provided the United States with information regarding the means by which individuals could join al-Qaeda, see Gov't 5K1.1 letter at 8 – something that can be assumed to have been particularly useful to the United States intelligence community given that Mr. Vinas, a born-and-bread American citizen of Christian descent, was able to convert to Islam, travel to Afghanistan, and join al-Qaeda even though he had no prior contacts with the terrorist group.

Mr. Vinas also provided the United States with unparalleled insight into the organizational structure and leadership of al-Qaeda, see Gov't 5K1.1 letter at 8-9 – something the United States was attempting, and thereafter succeeded, at disrupting to the point where al-Qaeda is unquestionably not viewed as the operational threat that it was prior to Mr. Vinas's decision to cooperate with American authorities. To that end, Mr. Vinas provided the United States with information relating to al-Qaeda communications, training and tactics, al-Qaeda's international program, information about specific al-Qaeda members, and other terrorist groups as well. See Gov't 5K1.1 letter at 8-11. Mr. Vinas also provided assistance to other countries who were fighting their own fronts on the war on terror, presumably as direct allies to the United States as well as in regard to their own independent operations. See Gov't 5K1.1 letter at 11-13.

Omitted from the Government's publicly filed 5K1.1 letter, but revealed in other unclassified, public, sources, Mr. Vinas's "early statements" to the United States government "led almost immediately to successful drone strikes in tribal areas … and he later became one of the government's most prized intelligence assets on Al Qaeda's operations and leadership." William K. Rashbaum, *One U.S. Prosecutor in Brooklyn in Behind Many Terrorism Convictions*, NY Times (July 6, 2010) (emphasis added) (available at <http://www.nytimes.com/2010/07/07/nyregion/07prosecutor.html>) (last accessed, April 30, 2017).

Indeed, as implied in even the heavily-redacted version of the Government's 5K1.1 letter, Mr. Vinas's information "was shared with and used by the United States military, and by intelligence and law enforcement agencies of the United States and its allies." Id.; see also Gov't 5K1.1 letter at 8-13; see also Michael Powell, *U.S. Recruit Reveals How Qaeda Trains Foreigners*, NY Times (July 23, 2009) (available at <http://www.nytimes.com/2009/07/24/nyregion/24terror.html?pagewanted=all) (last accessed, April 30, 2017) (among other things describing, based upon a transcript that was publicly released in connection with a Belgium terrorism prosecution, "Mr. Vinas's unlikely odyssey, replete with details on how Al Qaeda uses

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 5 of 9

applications and written evaluations of students, directs terrorist camp life, and trains recruits to handle silencers and build suicide bomb vests").

Recently determined to be unclassified is a partially redacted transcript of the previously classified proceedings held on April 20, 2017, wherein the Court and the parties discussed nine questions that the defense had posed to the Government after reviewing certain of the classified material in that case. The portions of the transcript that have been determined to be unclassified reveal defense counsel's questions as well as the Government's answers, thereby declassifying that information. What was clarified during those proceedings provides additional, substantial, support for a sentence of time-served.[2]

Defense counsels' questions were as follows:

1. "With respect to any of the information provided … by Mr. Vinas, including information that is specifically referenced … as having been, quote, assessed to be historical or potential leads to Usama bin Laden and Ayman al-Zawahiri, did any such information assist the United States in obtaining the location of Usama bin Laden or Ayman al-Zawahiri[?]" Unclassified Transcript, dated, April 20, 2017 (hereinafter cited as, "U.Tr."), at 4 (classified information omitted).

2. "With respect to the above, did any of such information assist in the capture or death of Usama bin Laden or Ayman al-Zawahiri[?]" Id.

3. "Please provide an estimate of the number of acts of terrorism targeting people or places within the United States that were disrupted as a result of the information provided by Mr. Vinas to the United States, including the FBI, the DOJ, and the IC [intelligence community] and/or to, quote, U.S. foreign liaison partners, end quote." U.Tr. 4-5 (emphasis added).

4. "Please provide an estimate of the number of acts of terrorism targeting people or places outside of the United States that were, quote, disrupt[ed], end quote, as the result of the information provided by Mr. Vinas to the United States, including the FBI, the DOJ, and the IC." U.Tr. 6 (emphasis added).

5. "Was information provided by Mr. Vinas relied upon by the United States for military purposes; if so, please provide a summary[?]" U.Tr. 7.

6. "Was information provided by Mr. Vinas relied upon by the United States in relation to drone strikes of specific targets; if so, please provide an estimate of the number of strikes that were launched that relied upon such information, as well as an estimate of the number of strikes that were successfully completed as a result of such information[?]" U.Tr. 7.

---

[2] For the Court's convenience, a copy of the unclassified transcript of the April 20, 2017 proceedings is attached hereto.

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 6 of 9

      7.  "Has the IC been able to successfully infiltrate al-Qaeda as a result of the information provided by Mr. Vinas[?]"  U.Tr. 7.

      8.  "Has the IC been able to successfully infiltrate any other terrorist organization, including but not limited to ISIS, as a result of the information provided by Mr. Vinas[?]" U.Tr. 7-8.

      9.  "Please identify whether the answer to any of the questions listed above is revealed in the paragraphs that are redacted in the government's letter…." U.Tr. 8 (classified information omitted).

The Government's answer to the questions regarding Usama bin Laden and Ayman al-Zawahiri was "no." U.Tr. 4.  The Government's answer to our request for an estimate of the number of acts of terrorism targeting people or places within the United States that were disrupted as a result of the information provided by Mr. Vinas was to state that the answer was "set forth in the government's previously filed submissions."  U.Tr. 5 (emphasis added).  With respect to questions 4 through 8, however, the Government took the position that it has "already provided that to the extent that [they] have such information." U.Tr. 7.  And with respect to the request to confirm whether the answer to any of the previous questions is revealed in the redacted portions of the Government's classified submission, the Government responded that "the basis for not providing that answer would be the same basis for why we redacted those paragraphs in the first instance."  See U.Tr. 8; see also U.Tr. 10 (the Government confirming its belief that the defense does not have a need to know the answer to Question 9).

The dichotomy of the Government's position is a bit flummoxing – providing a clear "no" in response to the first two questions, providing what is essentially a "yes" to the third question, but then refusing to directly answer, or answer at all, any of the remaining questions.  Nonetheless, the Government's position is quite revealing as well.  It tells three things: First, when the answer is unhelpful to the defense the Government is willing to answer. Second, when it is helpful and already revealed the Government is willing to confirm that it has provided the information already. However, third, when the information is helpful but still being withheld, the Government claims that the defense either does not have a need to know or that some of the information may not be in the Government's possession, presumably because even the United States Attorney's Office is viewed as not having a need to know.  While this might sound odd, when dealing with classified information it is common for the United States Attorney's Office to receive some or most but not all of the classified information in the possession of the intelligence community.

We have no doubt that the Government has disclosed to this Court all of the information in its possession, but that merely means that they have disclosed it "to the extent that [they] have such information" (U.Tr. 7) (emphasis added).  Thus, it appears reasonable to conclude from a comparison of the Government's answers to its non-answers, that additional, favorable, information exists that has not been disclosed to the United States Attorney's Office and in turn not revealed to the Court or the defense.  What we can assume from the Government's willingness to answer a clear "no" to Questions 1 and 2, is that that the answer to Questions 4 through 8, to one extent or another, are all a clear "yes".  Therefore it is reasonable to assume based upon the

Government's answers that *yes* as a result of the information provided by Mr. Vinas the United States government in all its varying forms has: successfully disrupted acts of terrorism targeting people or places <u>outside</u> of the United States; relied upon the information provided by Mr. Vinas for military purposes; to conduct drone strikes; to successfully infiltrate al-Qaeda; and to successfully infiltrate other terrorist organizations.

However, even if this Court decides not to make the logical connection that we suggest, there appears to be no dispute that the information that remains redacted even from defense counsel's eyes is extraordinary, and in itself provides a basis to sentence Mr. Vinas to time-served. When asked by this Court directly whether the Government would take issue with the defense position that Mr. Vinas's cooperation was the proximate cause of the diminished capacity of al-Qaeda, the Government responded, "As a practical matter, probably not, Your Honor.  I think [the defense] wil be able to make [their] full-thrated argument in favor of [their] client, and I think frankly, Your Honor, <u>the government would be doing the same</u>." U.Tr. 14 (emphasis added).

As Your Honor then noted, "I've read the materials and it's clear to the Court that <u>the redacted material is extremely helpful</u> to the Court <u>in a very positive way</u> in how it looks at the defendant's cooperation, that this is <u>extremely significant and very positive in any argument that the defense makes in connection with the best possible sentencing results for the defendant</u>." U.Tr. 15-16 (emphasis added).

Finally, beyond Mr. Vinas's "substantial assistance", there remains the question of what Mr. Vinas will do next, assuming he is released?  Mr. Vinas has asked that we not discuss his family or upbringing in this submission.  He believes, and we agree, that his family has been in the crosshairs of the media-eye long enough.  But for Mr. Vinas's conduct his family would be permitted to live an ordinary life.  Mr. Vinas regrets that such is no longer the case and does not want to make a difficult situation worse.  As such, we simply refer this Court to Mr. Vinas's Pre-Sentence Report, dated, November 11, 2008, and ask that this Court give the Probation Department's explication the consideration it deserves.

That being said, the question remains, "What's next for Mr. Vinas?"  To that question there appears to be a much simpler and humbler answer.  Mr. Vinas looks most forward to the simple things.  He looks forward to getting back-surgery, which is long overdue and could not be effectively treated while in wit-sec.  He looks forward to breathing fresh aid and sleeping on a better mattress.  He looks forward to being known by a name rather than initials.  And he dreams one day to find work as a counter-terrorism expert, essentially turning his lengthy cooperation into a career.

Assuming he is given the opportunity, these simple things all have a chance at being accomplished, and we note that defense counsel have received inquiries about whether Mr. Vinas would be willing to work as a counter-terrorism expert after his release.  While Mr. Vinas is a long way from receiving employment in that field, it is notable that the opportunity may in fact exist for him to achieve that dream at some point down the line.  If accomplished, Mr. Vinas will then spend his working life making something good and useful out of his darkest mistakes.  Similarly, Mr. Vinas has offered to continue to assist the Government in whatever way requested, including

additional testimony, if sought.  After eight and a half years of cooperation, Mr. Vinas merely wants to be sentenced, but he does not seek to end his usefulness to the United States government.

**IV.      The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.**

Mr. Vinas has been in custody for approximately eight and a half, which is the equivalent of a 10-year sentence once one takes into account good behavior, or "good time" as it is referred to by the Bureau of Prisons.  In light of Mr. Vinas's cooperation, such is a lengthy and substantial sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.

**V.       The need for the sentence imposed to afford adequate deterrence to criminal conduct.**

There are two types of deterrence: general and specific; both, we submit, would be satisfied by a sentence of "time served" (i.e., 120 months) in this case.  Certainly, the eight and half years that Mr. Vinas has spent in wit-sec is an experience he would never want to repeat, so there should be no doubt regarding the adequacy of specific deterrence.  As to general deterrence, considering the fact that Mr. Vinas "began assisting the government immediately upon his transfer to the custody of the United States after his arrest in Pakistan[, and has] also continued to provide information in a timely manner as new issues and questions arose during the course of his cooperation" (Gov't 5K1.1 letter at 16), a sentence equivalent to 120 months provides a strong statement that the best-case scenario for home-grown terrorists – even those who cooperate – is still a substantial and lengthy term of imprisonment.  Such, we submit, affords adequate general deterrence to criminal conduct as well.

**VI.      The need for the sentence imposed to protect the public from further crimes of the defendant.**

In the Government's own words, "The defendant's assistance came in the face of potential danger to himself…. Terrorist organizations such as al-Qaeda have publicized the fact that they may target individuals who betray or cooperate against them.  By aligning himself with the government against al-Qaeda, Vinas has assumed such a risk." Gov't 5K1.1 letter at 16.  The defense submits that the term of imprisonment that Mr. Vinas has served thus far, coupled with the target that will forever be placed on his back by groups that he cooperated against, make it reasonable to conclude that a sentence of "time served" is sufficient to protect the public in this manner.

**VII.     The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no dispute that Mr. Vinas is in dire need of vocational training and medical care, since neither has been effectively available to him in wit-sec.  Since Mr. Vinas is unable to receive

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 9 of 9

the services that he requires until his release, a sentence of "time served" would necessarily impose a sentence that provides Mr. Vinas with his needed training and care in the most effective manner.

## VIII.   Conclusion

Once again, Mr. Vinas's turn from terrorist to counter-terrorist saved countless lives, both domestically and abroad.  His assistance substantially diminished the capacity of what had been the western world's greatest adversary, and in doing so provided unparalleled information that can be used to ward off threats that remain in varying forms today – not merely against al-Qaeda, but ISIS and other terrorist groups as well.  Assistance of this global importance cannot truly be quantified – it is extraordinary, unparalleled, and previously only the stuff of dreams.

Accordingly, we respectfully submit that Mr. Vinas should be sentenced to "time served", essentially equal to a sentence of ten years' imprisonment.  While Mr. Vinas cannot take back his mistakes, he has done everything in his power to make up for them, and as a result he will spend the rest of his life with a target on his back.  Let that life be lived in freedom, and hopefully the next Bryant Neal Vinas will follow his positive example and become equally extraordinary as a result.

As always, we thank Your Honor for your time and consideration.

Respectfully submitted,

/S/

Michael K. Bachrach
Steve Zissou
*Attorneys for Bryant Neal Vinas*

cc:      All parties of record (by ECF)