LAW OFFICE OF

# MICHAEL K. BACHRACH

276 FIFTH AVENUE, SUITE 501
NEW YORK, N.Y. 10001
--------------
TEL. (212) 929-0592 · FAX. (866) 328-1630

MICHAEL K. BACHRACH *
* admitted in N.Y., MN and D.C.

http://www.mbachlaw.com
michael@mbachlaw.com

May 5, 2017

By ECF

The Hon. Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*Re: United States v. Bryant Neal Vinas,*
*08 Cr. 823 (NGG)*

### DEFENDANT'S SENTENCING MEMORANDUM

Dear Judge Garaufis:

We represent Defendant Bryant Neal Vinas and write in advance of sentencing to seek a sentence that is fair and just, sufficient, but not greater than necessary to serve the purposes of sentencing. We acknowledge at the outset that the determination of the appropriate sentence in this case is a daunting task for all parties concerned. Mr. Vinas was, during the darkest period of his life, a terrorist. However, we can proudly state that Mr. Vinas took the worst experience in his life and turned himself into one of America's greatest weapons against al-Qaeda. Stated simply, he saved lives, and he helped the United States government substantially dismantle what had been the greatest threat to our nation and to our Western allies. As such, we write to respectfully request a sentence of "time served", which equals a sentence of approximately ten years.

## I.    Charge and Conviction

On January 28, 2009, Mr. Vinas pleaded guilty before this Court to all three counts of a three-count Superseding Information. Count 1 charged Mr. Vinas with conspiracy to murder United States nationals in violation of 18 U.S.C. § 2332(b)(2), Count 2 charged Mr. Vinas with providing material support to a foreign terrorist organization in violation of 18 U.S.C. §§ 2339B(a)(1), 2339B(d)(1)(A), and Count 3 charged him with receiving military-type training from a foreign terrorist organization in violation of 18 U.S.C. §§ 2339D(a), 2339D(b)(1).

Stated succinctly, Mr. Vinas was convicted of joining al-Qaeda. He faces a maximum sentence of life under Count 1, 15 years under Count 2, and 10 years under Count 3. There is, however, no mandatory minimum sentence in this case, and, as this Court is aware, Mr. Vinas's story does not end with him joining al-Qaeda. To the contrary, in many ways joining al-Qaeda is

merely a preamble to the events that followed – extraordinary events that warrant a sentence of "time served".  While Mr. Vinas's crimes cannot be forgiven, the unparalleled assistance he provided to the United States government after his arrest are indicative of a complex individual now on the path to redemption.

## II.     Sentencing Framework, Guidelines, and the Parsimony Clause

As is now well known, in Kimbrough v. United States, 128 S.Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in United States v. Booker, 534 U.S. 220 (2005), which requires District Courts to view the Guidelines as merely advisory, and instructs District Courts to tailor a sentence in light of all of the statutory concerns set forth in 18 U.S.C. § 3553(a).  Under 18 U.S.C. § 3553(a), District Courts are directed to impose the minimally-sufficient sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation – by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  See Kimbrough, 128 S.Ct. at 570.  This "parsimony provision" is "an overarching provision," representing a cap above which a District Court is statutorily prohibited from sentencing above, even when a greater sentence is recommended by the advisory Sentencing Guidelines.  To put it another way, pursuant to 18 U.S.C. § 3553(a), the Guidelines are to be viewed as statutorily subordinate to the parsimony clause.  See Kimbrough, 128 S.Ct. at 570; see also United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher").

Similarly, other statutory provisions also give the District Court direction in sentencing.  Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: In determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the court is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added).  Further, under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).

We do not dispute the Probation Department's Guideline calculations, and as such we agree with the Government that the "starting point" in determining Mr. Vinas's sentence is a Guideline range of 360 months to life.  That Guideline range, however, does not take into account Mr. Vinas's extraordinary and unparalleled assistance, nor the related fact that the Government has submitted multiple, overwhelming, 5K1.1 letters to this Court: one unclassified and publicly filed with redactions, one unclassified but filed ex parte and under seal, and one classified submission that provides this Court will all of the justification this Court needs to sentence Mr. Vinas as far below his advisory Guideline range as this Court deems appropriate.

Indeed, the "starting point" under the Guidelines does not take into account the extraordinary nature of Mr. Vinas's assistance – not merely to the United States Attorney's Office, but also to the intelligence community, our military, and our allies.  As such, this case, likely more

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 3 of 9

than any other case previously before this Court, is a prime example of where the parsimony clause of Section 3553(a) is what most appropriately drives Mr. Vinas's sentence, not the generic Guideline range.

## III.   The nature and circumstances of the offense and the history and characteristics of the defendant.

The Government states in its 5K1.1 letter, "To say that the defendant provided substantial assistance to the government is an understatement.  Indeed, he may have been the single most valuable cooperating witness available to the government and law enforcement agencies with respect to al-Qaeda and associated topics related to the time period in which Vinas travelled to and was operational in Afghanistan and Pakistan between 2007 and 2008" (Gov't 5K1.1 letter, dated, February 3, 2017, at 6).[1]  Take that in context and one can quickly surmise why the Government does not dispute our belief that, "Given what we know about the last decade and what is [we] think a well-known fact that al-Qaeda's operational capability has been severely diminished over the last ten years … Mr. Vinas was the proximate cause of that diminished operational capability" (Transcript, dated, April 20, 2017, at 9-10).

Just days after the 2008 Presidential election, Mr. Vinas was arrested on November 11, 2008, by Pakistani officials.  While Mr. Vinas initially resisted the questioning of the Pakistani officials, "[h]e was ultimately subdued" (Gov't 5K1.1 letter at 6 n.6), and began answering questions from that point forward.  How Mr. Vinas was "subdued" is a question the Government does not address in its 5K1.1 letter, but one can assume it was done *less gently* than would have been required had he been in United States custody at the time.

On November 21, 2008, *twenty days later*, Mr. Vinas was transferred to United States custody and extradited for prosecution in a United States court.  Mr. Vinas was arraigned before Your Honor on November 22, 2008, in a proceeding where nearly every person in the courtroom (except Your Honor) was outfitted with bullet-proof vests.  On January 28, 2009, just eight days after Barak Obama was sworn in as our nation's 44th President, Mr. Vinas pleaded guilty pursuant to a cooperation agreement, thus formalizing for purposes of domestic law Mr. Vinas's agreement to assist the United States in its war on terror.

Domestically, Mr. Vinas provided the Government with "critical information relating to domestic threats and al-Qaeda external operations planning against the United States" (Gov't 5K1.1 letter at 7).  Mr. Vinas provided substantial assistance with the Government's prosecution of those involved in the plot to blow up the Long Island Rail Road, as well as other individuals residing in New York City and Long Island.  See Gov't 5K1.1 letter at 6-7.

---

[1]      In order to ensure compliance with this Court's Order, dated, March 24, 2017 (Doc. No. 49), which denied a request to unseal the entirety of the Government's 5K1.1 letter but permit the unsealing of a heavily-redacted version of that letter, all quotations herein are taken from the publicly available portions of the Government's submission.  We ask, however, that when this Court reviews the quoted statements this Court does so from the sealed and fully unredacted version.

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 4 of 9

In addition, Mr. Vinas "directly contributed to the prosecution of numerous individuals by the U.S. government" (Gov't 5K1.1 letter at 13), and provided "powerful and compelling" testimony leading to the conviction, on all counts, of Adis Medunjanin, "[a] man who was convicted" in 2012 "of plotting with two friends to carry out a coordinated suicide attack on New York City subways." Mosi Secret, *Man Convicted of a Terrorist Plot to Bomb Subways Is Sent to Prison for Life*, NY Times (November 16, 2012) (available at <http://www.nytimes.com/ 2012/11/17/nyregion/adis-medunjanin-convicted-of-subway-bomb-plot-gets-life-sentence.html>) (last accessed, April 30, 2017).

However, it was the information that Mr. Vinas provided the United States government about al-Qaeda and its global operations that, in the Government's own words, "provided unparalleled insight into the internal and external operations of al-Qaeda" (Gov't 5K1.1 letter at 8). Mr. Vinas provided the United States with information regarding the means by which individuals could join al-Qaeda, see Gov't 5K1.1 letter at 8 – something that can be assumed to have been particularly useful to the United States intelligence community given that Mr. Vinas, a born-and-bread American citizen of Christian descent, was able to convert to Islam, travel to Afghanistan, and join al-Qaeda even though he had no prior contacts with the terrorist group.

Mr. Vinas also provided the United States with unparalleled insight into the organizational structure and leadership of al-Qaeda, see Gov't 5K1.1 letter at 8-9 – something the United States was attempting, and thereafter succeeded, at disrupting to the point where al-Qaeda is unquestionably not viewed as the operational threat that it was prior to Mr. Vinas's decision to cooperate with American authorities. To that end, Mr. Vinas provided the United States with information relating to al-Qaeda communications, training and tactics, al-Qaeda's international program, information about specific al-Qaeda members, and other terrorist groups as well. See Gov't 5K1.1 letter at 8-11. Mr. Vinas also provided assistance to other countries who were fighting their own fronts on the war on terror, presumably as direct allies to the United States as well as in regard to their own independent operations. See Gov't 5K1.1 letter at 11-13.

Omitted from the Government's publicly filed 5K1.1 letter, but revealed in other unclassified, public, sources, Mr. Vinas's "early statements" to the United States government "led almost immediately to successful drone strikes in tribal areas ... and he later became one of the government's most prized intelligence assets on Al Qaeda's operations and leadership." William K. Rashbaum, *One U.S. Prosecutor in Brooklyn in Behind Many Terrorism Convictions*, NY Times (July 6, 2010) (emphasis added) (available at <http://www.nytimes.com/2010/07/07/ nyregion/07prosecutor.html>) (last accessed, April 30, 2017).

Indeed, as implied in even the heavily-redacted version of the Government's 5K1.1 letter, Mr. Vinas's information "was shared with and used by the United States military, and by intelligence and law enforcement agencies of the United States and its allies." Id.; see also Gov't 5K1.1 letter at 8-13; see also Michael Powell, *U.S. Recruit Reveals How Qaeda Trains Foreigners*, NY Times (July 23, 2009) (available at <http://www.nytimes.com/2009/07/24/nyregion/ 24terror.html?pagewanted=all) (last accessed, April 30, 2017) (among other things describing, based upon a transcript that was publicly released in connection with a Belgium terrorism prosecution, "Mr. Vinas's unlikely odyssey, replete with details on how Al Qaeda uses

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 5 of 9

applications and written evaluations of students, directs terrorist camp life, and trains recruits to handle silencers and build suicide bomb vests").

Recently determined to be unclassified is a partially redacted transcript of the previously classified proceedings held on April 20, 2017, wherein the Court and the parties discussed nine questions that the defense had posed to the Government after reviewing certain of the classified material in that case. The portions of the transcript that have been determined to be unclassified reveal defense counsel's questions as well as the Government's answers, thereby declassifying that information. What was clarified during those proceedings provides additional, substantial, support for a sentence of time-served.[2]

Defense counsels' questions were as follows:

1. "With respect to any of the information provided … by Mr. Vinas, including information that is specifically referenced … as having been, quote, assessed to be historical or potential leads to Usama bin Laden and Ayman al-Zawahiri, did any such information assist the United States in obtaining the location of Usama bin Laden or Ayman al-Zawahiri[?]" Unclassified Transcript, dated, April 20, 2017 (hereinafter cited as, "U.Tr."), at 4 (classified information omitted).

2. "With respect to the above, did any of such information assist in the capture or death of Usama bin Laden or Ayman al-Zawahiri[?]" Id.

3. "Please provide an estimate of the number of acts of terrorism targeting people or places within the United States that were disrupted as a result of the information provided by Mr. Vinas to the United States, including the FBI, the DOJ, and the IC [intelligence community] and/or to, quote, U.S. foreign liaison partners, end quote." U.Tr. 4-5 (emphasis added).

4. "Please provide an estimate of the number of acts of terrorism targeting people or places outside of the United States that were, quote, disrupt[ed], end quote, as the result of the information provided by Mr. Vinas to the United States, including the FBI, the DOJ, and the IC." U.Tr. 6 (emphasis added).

5. "Was information provided by Mr. Vinas relied upon by the United States for military purposes; if so, please provide a summary[?]" U.Tr. 7.

6. "Was information provided by Mr. Vinas relied upon by the United States in relation to ▮▮▮▮▮▮ of specific targets; if so, please provide an estimate of the number of ▮▮▮▮▮▮▮▮▮▮▮ that relied upon such information, as well as an estimate of the number of ▮▮▮▮ that were successfully completed as a result of such information[?]" U.Tr. 7.

---

[2]    For the Court's convenience, a copy of the unclassified transcript of the April 20, 2017 proceedings is attached hereto.

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 6 of 9

7. "Has the IC been able to successfully infiltrate al-Qaeda as a result of the information provided by Mr. Vinas[?]"  U.Tr. 7.

8. "Has the IC been able to successfully infiltrate any other terrorist organization, including but not limited to ISIS, as a result of the information provided by Mr. Vinas[?]" U.Tr. 7-8.

9. "Please identify whether the answer to any of the questions listed above is revealed in the paragraphs that are redacted in the government's letter…." U.Tr. 8 (classified information omitted).

The Government's answer to the questions regarding Usama bin Laden and Ayman al-Zawahiri was "no." U.Tr. 4.  The Government's answer to our request for an estimate of the number of acts of terrorism targeting people or places <u>within</u> the United States that were disrupted as a result of the information provided by Mr. Vinas was to state that the answer was "set forth in the government's previously filed <u>submissions</u>."  U.Tr. 5 (emphasis added).  With respect to questions 4 through 8, however, the Government took the position that it has "already provided that to the extent that [they] have such information." U.Tr. 7.  And with respect to the request to confirm whether the answer to any of the previous questions is revealed in the redacted portions of the Government's classified submission, the Government responded that "the basis for not providing that answer would be the same basis for why we redacted those paragraphs in the first instance."  <u>See</u> U.Tr. 8; <u>see also</u> U.Tr. 10 (the Government confirming its belief that the defense does not have a need to know the answer to Question 9).

The dichotomy of the Government's position is a bit flummoxing – providing a clear "no" in response to the first two questions, providing what is essentially a "yes" to the third question, but then refusing to directly answer, or answer at all, any of the remaining questions.  Nonetheless, the Government's position is quite revealing as well.  It tells three things: First, when the answer is unhelpful to the defense the Government is willing to answer. Second, when it is helpful and already revealed the Government is willing to confirm that it has provided the information already. However, third, when the information is helpful but still being withheld, the Government claims that the defense either does not have a need to know or that some of the information may not be in the Government's possession, presumably because even the United States Attorney's Office is viewed as not having a need to know.  While this might sound odd, when dealing with classified information it is common for the United States Attorney's Office to receive some or most but not all of the classified information in the possession of the intelligence community.

We have no doubt that the Government has disclosed to this Court all of the information in its possession, but that merely means that they have disclosed it "<u>to the extent that [they] have such information</u>" (U.Tr. 7) (emphasis added).  Thus, it appears reasonable to conclude from a comparison of the Government's answers to its non-answers, that additional, favorable, information exists that has not been disclosed to the United States Attorney's Office and in turn not revealed to the Court or the defense.  What we can assume from the Government's willingness to answer a clear "no" to Questions 1 and 2, is that that the answer to Questions 4 through 8, to one extent or another, are all a clear "yes".  Therefore it is reasonable to assume based upon the

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 7 of 9

Government's answers that *yes* as a result of the information provided by Mr. Vinas the United States government in all its varying forms has: successfully disrupted acts of terrorism targeting people or places <u>outside</u> of the United States; relied upon the information provided by Mr. Vinas for military purposes; to conduct ███████████; to successfully infiltrate al-Qaeda; and to successfully infiltrate other terrorist organizations.

However, even if this Court decides not to make the logical connection that we suggest, there appears to be no dispute that the information that remains redacted even from defense counsel's eyes is extraordinary, and in itself provides a basis to sentence Mr. Vinas to time-served. When asked by this Court directly whether the Government would take issue with the defense position that Mr. Vinas's cooperation was the proximate cause of the diminished capacity of al-Qaeda, the Government responded, "As a practical matter, probably not, Your Honor. I think [the defense] wil be able to make [their] full-thrated argument in favor of [their] client, and I think frankly, Your Honor, <u>the government would be doing the same</u>." U.Tr. 14 (emphasis added).

As Your Honor then noted, "I've read the materials and it's clear to the Court that <u>the redacted material is extremely helpful</u> to the Court <u>in a very positive way</u> in how it looks at the defendant's cooperation, that this is <u>extremely significant and very positive in any argument that the defense makes in connection with the best possible sentencing results for the defendant</u>." U.Tr. 15-16 (emphasis added).

Finally, beyond Mr. Vinas's "substantial assistance", there remains the question of what Mr. Vinas will do next, assuming he is released? Mr. Vinas has asked that we not discuss his family or upbringing in this submission. He believes, and we agree, that his family has been in the crosshairs of the media-eye long enough. But for Mr. Vinas's conduct his family would be permitted to live an ordinary life. Mr. Vinas regrets that such is no longer the case and does not want to make a difficult situation worse. As such, we simply refer this Court to Mr. Vinas's Pre-Sentence Report, dated, November 11, 2008, and ask that this Court give the Probation Department's explication the consideration it deserves.

That being said, the question remains, "What's next for Mr. Vinas?" To that question there appears to be a much simpler and humbler answer. Mr. Vinas looks most forward to the simple things. He looks forward to getting back-surgery, which is long overdue and could not be effectively treated while in ████████. He looks forward to breathing fresh aid and sleeping on a better mattress. He looks forward to being known by a name rather than initials. And he dreams one day to find work as a counter-terrorism expert, essentially turning his lengthy cooperation into a career.

Assuming he is given the opportunity, these simple things all have a chance at being accomplished, and we note that defense counsel have received inquiries about whether Mr. Vinas would be willing to work as a counter-terrorism expert after his release. While Mr. Vinas is a long way from receiving employment in that field, it is notable that the opportunity may in fact exist for him to achieve that dream at some point down the line. If accomplished, Mr. Vinas will then spend his working life making something good and useful out of his darkest mistakes. Similarly, Mr. Vinas has offered to continue to assist the Government in whatever way requested, including

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 8 of 9

additional testimony, if sought.  After eight and a half years of cooperation, Mr. Vinas merely wants to be sentenced, but he does not seek to end his usefulness to the United States government.

**IV.     The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.**

Mr. Vinas has been in custody for approximately eight and a half, which is the equivalent of a 10-year sentence once one takes into account good behavior, or "good time" as it is referred to by the Bureau of Prisons.  In light of Mr. Vinas's cooperation, such is a lengthy and substantial sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.

**V.     The need for the sentence imposed to afford adequate deterrence to criminal conduct.**

There are two types of deterrence: general and specific; both, we submit, would be satisfied by a sentence of "time served" (i.e., 120 months) in this case.  Certainly, the eight and half years that Mr. Vinas has spent in ████ is an experience he would never want to repeat, so there should be no doubt regarding the adequacy of specific deterrence.  As to general deterrence, considering the fact that Mr. Vinas "began assisting the government immediately upon his transfer to the custody of the United States after his arrest in Pakistan[, and has] also continued to provide information in a timely manner as new issues and questions arose during the course of his cooperation" (Gov't 5K1.1 letter at 16), a sentence equivalent to 120 months provides a strong statement that the best-case scenario for home-grown terrorists – even those who cooperate – is still a substantial and lengthy term of imprisonment.  Such, we submit, affords adequate general deterrence to criminal conduct as well.

**VI.     The need for the sentence imposed to protect the public from further crimes of the defendant.**

In the Government's own words, "The defendant's assistance came in the face of potential danger to himself…. Terrorist organizations such as al-Qaeda have publicized the fact that they may target individuals who betray or cooperate against them.  By aligning himself with the government against al-Qaeda, Vinas has assumed such a risk." Gov't 5K1.1 letter at 16.  The defense submits that the term of imprisonment that Mr. Vinas has served thus far, coupled with the target that will forever be placed on his back by groups that he cooperated against, make it reasonable to conclude that a sentence of "time served" is sufficient to protect the public in this manner.

**VII.     The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no dispute that Mr. Vinas is in dire need of vocational training and medical care, since neither has been effectively available to him in ████ Since Mr. Vinas is unable to receive

The Hon. Nicholas G. Garaufis
May 5, 2017
Page 9 of 9

the services that he requires until his release, a sentence of "time served" would necessarily impose a sentence that provides Mr. Vinas with his needed training and care in the most effective manner.

**VIII.   Conclusion**

Once again, Mr. Vinas's turn from terrorist to counter-terrorist saved countless lives, both domestically and abroad.  His assistance substantially diminished the capacity of what had been the western world's greatest adversary, and in doing so provided unparalleled information that can be used to ward off threats that remain in varying forms today – not merely against al-Qaeda, but ISIS and other terrorist groups as well.  Assistance of this global importance cannot truly be quantified – it is extraordinary, unparalleled, and previously only the stuff of dreams.

Accordingly, we respectfully submit that Mr. Vinas should be sentenced to "time served", essentially equal to a sentence of ten years' imprisonment.  While Mr. Vinas cannot take back his mistakes, he has done everything in his power to make up for them, and as a result he will spend the rest of his life with a target on his back.  Let that life be lived in freedom, and hopefully the next Bryant Neal Vinas will follow his positive example and become equally extraordinary as a result.

As always, we thank Your Honor for your time and consideration.

Respectfully submitted,

/S/

Michael K. Bachrach
Steve Zissou
*Attorneys for Bryant Neal Vinas*

cc:     All parties of record (by ECF)

1

**Filed with Classified
Information Security Officer**
CISO _____
Date ____4/2\/17____

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        08-CR-823(NGG)
3   UNITED STATES OF AMERICA,

4            Plaintiff,               United States Courthouse
                                      Brooklyn, New York
5            -against-               April 20, 2017
                                      2:00 p.m.
6   BRYANT VINAS,

7            Defendant.
    ------------------------------x
8           *** CONTAINS SEALED CLASSIFIED INFORMATION ***

9       TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION HEARING
        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
10          UNITED STATES SENIOR DISTRICT JUDGE

11  APPEARANCES

12  For the Government:      ROBERT L. CAPERS, ESQ.
                            United States Attorney
13                          Eastern District of New York
                            271 Cadman Plaza East
14                          Brooklyn, New York 11201
                            BY:  RICHARD M. TUCKER
15                               DAVID KESSLER
                                 SETH DuCHARME
16                          Assistant United States Attorneys

17                          SPECIAL AGENT FARBOD AZAD
                            INTELLIGENCE ANALYST ERIKA DAY
18                          JOINT INTELLIGENT TASK FORCE

19  For the Defendant:      STEVE ZISSOU & ASSOCIATES
                            42-40 Bell Boulevard, Suite 302
20                          Bayside, New York 11361
                            BY:  STEVE ZISSOU, ESQ.
21
    For the Defendant:      LAW OFFICES OF MICHAEL K. BACHRACH
22                          276 Fifth Avenue, Suite 501
                            New York, New York 10001
23                          BY:  MICHAEL K. BACHRACH, ESQ.

24  Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, OCR
                            Phone: 718-613-2330 Fax: 718-804-2712
25                          Email:  LindaDan226@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

UNCLASSIFIED

2

- CONTAINS SEALED CLASSIFIED INFORMATION -

1    (Continued from open court.)

2    THE COURT:  Can we have everyone appearance here?

3  Let's get everybody's appearance.  Start with the government

4  and everybody else.

5    MR. TUCKER:  Yes, Your Honor.

6    So for the government, Your Honor, Rich Tucker,

7  David Kessler and Seth DuCharme.  With us again in the back of

8  the room is Special Agent Farbod Azad, and Intelligence

9  Analyst Erika Day from the Joint Intelligent Task Force.

10    THE COURT:  Welcome to both of you.

11    All right.  And?

12    MR. ZISSOU:  Oh, Steve Zissou and Michael Bachrach

13  again for Mr. Vinas, who's not present.

14    THE COURT:  All right.  And he waived his

15  appearance.

16    MR. ZISSOU:  Yes, Your Honor.

17    THE COURT:  Yes, he wouldn't have his appearance any

18  way.

19    MR. ZISSOU:  Yes, Judge.

20    THE COURT:  All right, so the issue, I suppose, is

21  two redacted portions of the government's sealed submission to

22  the Court in connection with sentencing.

23    MR. TUCKER:  Classified submission.

24    THE COURT:  Classified submission.

25    MR. ZISSOU:  There's the letter we submitted asking

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*



3

- CONTAINS SEALED CLASSIFIED INFORMATION -

1   questions.

2          THE COURT:  Yes, tell me which letter we're talking

3   about.

4          MR. ZISSOU:  Mr. Bachrach will describe it.

5          MR. BACHRACH:  This letter --

6          MR. ZISSOU:  It's dated, what date it is?

7          THE COURT:  March 23rd.

8          Do you have it?

9          MR. TUCKER:  I do, Your Honor.

10         MR. BACHRACH:  This letter --

11         THE COURT:  I think we have nine items.

12         MR. BACHRACH:  Correct, Your Honor.

13         MR. ZISSOU:  The government responded on April 3rd.

14  That's their classified response.

15         THE COURT:  So why don't we just -- it would be

16  helpful for me if we just went through the nine items.

17         MR. TUCKER:  Sure.

18         THE COURT:  And we have the items and the response,

19  but why don't we put it all, you know, as long as we're here

20  together today --

21         MR. ZISSOU:  Sure.

22         THE COURT:  -- put it into the record.

23         Why don't I just read the item and then we can

24  discuss it.

25         MR. ZISSOU:  Fair enough.

UNCLASSIFIED

```
                                                          4
            - CONTAINS SEALED CLASSIFIED INFORMATION -
 1          THE COURT:  A March 23rd, 2017 letter from the
 2   defense under seal, presumptively classified.
 3          The first issue is, one:  With respect to any of the
 4   information provided            by Mr. Vinas, including
 5   information that is specifically referenced
 6   as having been, quote, assessed to be historical or potential
 7   leads to Usama bin Laden and Ayman al-Zawahiri, did any
 8   such information assist the United States in obtaining the
 9   location of Usama bin Laden or Ayman al-Zawahiri.  And so
10   on that one --
11          MR. ZISSOU:  Their answer is on page 2 of their
12   letter.
13          THE COURT:  Their letter.  Thank you.
14          In answer to that question, the answer was "no".  I
15   mean I'm not going to read it.  The answer's "no".  So that
16   question was answered.
17          MR. ZISSOU:  Yes.
18          THE COURT:  Number two requests:  With respect to
19   the above, did any of such information assist in the capture
20   or death of Usama bin Laden or Ayman al-Zawahiri, and the
21   answer was to that, and the government's response was "no".
22          MR. TUCKER:  Correct, Your Honor.
23          THE COURT:  Right?
24          MR. BACHRACH:  Yes, Your Honor.
25          THE COURT:  Third question:  Please provide an
```

UNCLASSIFIED

UNCLASSIFIED

5

- CONTAINS SEALED CLASSIFIED INFORMATION -

1    estimate of the number of acts of terrorism targeting people

2    or places within the United States that were disrupted as a

3    result of the information provided by Mr. Vinas to the United

4    States, including the FBI, the DOJ, and the IC and/or to,

5    quote, U.S. foreign liaison partners, end quote.

6            The third bullet in the response, is that responsive

7    to that?

8                MR. TUCKER:  It is, Your Honor.

9                THE COURT:  Well, let me just read it.

10               The response in the April 3rd; is it?

11               MR. TUCKER:  Yes, Your Honor.

12               THE COURT:  Letter of the government is, quote, the

13   terrorist plot disrupted as a result of the defendant's

14   cooperation as set forth in the government's previously filed

15   submissions, end quote.

16               So that was answered.  All right.  Okay.

17               Then we move on to number four through nine.

18               MR. TUCKER:  Yes, Your Honor.

19               THE COURT:  And as to those, as to all of them, the

20   government states that with respect to the remaining

21   interrogatories contained in your March 23, 2017 submission,

22   the government rests on its prior submissions.  That's what

23   you answered.

24               MR. TUCKER:  Yes, Your Honor.

25               THE COURT:  Your answer was you didn't specifically

UNCLASSIFIED

6

- CONTAINS SEALED CLASSIFIED INFORMATION -

1    answer each one, you simply provided a catch-all answer.

2            MR. TUCKER:  Yes, Your Honor.

3            MR. ZISSOU:  That's what they did.

4            THE COURT:  All right.  And is that the subject of

5    this meeting?

6            MR. BACHRACH:  Yes, Your Honor.  That and the

7    redacted information.  And the next question is the overlap.

8            THE COURT:  Well, let me just read them then.

9    Because it's helpful to me to read them.  I don't know about

10   you, but it helps me.

11           Number four:  Please provide an estimate of the

12   number of acts of terrorism targeting people or places outside

13   the United States that were, quote, disruptive, end quote, as

14   the result of the information provided by Mr. Vinas to the

15   United States, including the FBI, the DOJ, and the IC.  I'm

16   sorry, what is IC?

17           MR. BACHRACH:  International community.

18           MR. TUCKER:  Intelligence community.

19           MR. ZISSOU:  Intelligence community.

20           THE COURT:  Is that the domestic intelligence

21   community or the intelligence community of the world?

22           MR. TUCKER:  The way that we use the term, Your

23   Honor, it would be American intelligence agencies.

24           THE COURT:  For my information.

25           MR. BACHRACH:  And I'm quoting one of their

UNCLASSIFIED

7

- CONTAINS SEALED CLASSIFIED INFORMATION -

1  submissions, Your Honor.

2       THE COURT:  All right.  And/or to, quote, U.S.

3  foreign liaison partners, end quote.

4       So your response to that is you've already provided

5  that to the extent that you have such information.

6       MR. TUCKER:  That's correct, Your Honor.

7       THE COURT:  Five:  Was information provided by

8  Mr. Vinas relied upon by the United States for military

9  purposes; if so, please provide a summary.  And same answer.

10       MR. TUCKER:  Correct, Your Honor.

11       THE COURT:  Six:  Was information provided by

12  Mr. Vinas relied upon by the United States in relation to

13       █████████ of specific targets; if so, please provide an

14  estimate of the number of █████████████████ that

15  relied upon such information, as well as an estimate of the

16  number of ███████ that were successfully completed as a result

17  of such information.  You provided the same answer.

18       MR. TUCKER:  Yes, Your Honor.

19       THE COURT:  Seven:  Has the IC been able to

20  successfully infiltrate al-Qaeda as the result of the

21  information provided by Mr. Vinas.  You have the same answer.

22       MR. TUCKER:  Yes, Your Honor.

23       THE COURT:  Number eight:  Has the IC been able to

24  successfully infiltrate any other terrorist organization,

25  including but not limited to ISIS, as a result of the

UNCLASSIFIED

8

– CONTAINS SEALED CLASSIFIED INFORMATION –

1    information provided by Mr. Vinas.  Same answer.

2              MR. TUCKER:  Yes, Your Honor.

3              THE COURT:  Nine:  Please identify whether the

4    answer to any of the questions listed above is revealed in the

5    paragraphs that are redacted in the government's classified

6    letter [                    ] And you give the same answer to

7    that, although that answer would not be found in your

8    submissions.

9              MR. TUCKER:  It's a fair point, Your Honor.  I guess

10   what I mean by that is the basis for not providing that answer

11   would be the same basis for why we redacted those paragraphs

12   in the first instance.

13             THE COURT:  Oh, okay.  So it really doesn't apply to

14   paragraph 9.

15             MR. TUCKER:  I think that's right, Your Honor.

16             THE COURT:  But what applies to paragraph 9 is the

17   redaction of the two items in the other letter.

18             MR. TUCKER:  The government's classified submission.

19             THE COURT:  The classified submission, which we

20   have, I think.

21             THE LAW CLERK:  You have it, Your Honor.

22             THE COURT:  Yes, let me just have that.

23             MR. BACHRACH:  I mean the original, I'm sorry.

24             THE COURT:  Right.  I also have the redacted

25   version.



UNCLASSIFIED

- CONTAINS SEALED CLASSIFIED INFORMATION -

9

1      MR. BACHRACH: Yes, Your Honor.

2      THE COURT: Let's just not confuse ourselves.  Take

3   a look.

4      (Pause.)

5      THE COURT: All right.  So what I'm being told about

6   paragraphs 4 through 8 is you already -- the government's

7   position is you have the information.  That was already

8   provided to you.  Is that right?

9      MR. TUCKER: Well, that's certainly true, Your

10  Honor, I think --

11     THE COURT: But it's not provided in the form that

12  it's requested.  I think that's the difference.  That what

13  you're saying is that in the prior submissions to the defense,

14  the information that's requested is somewhere found within

15  that material.

16     MR. TUCKER: I think that's right, Your Honor.  I

17  would just modulate that answer slightly to say that certain

18  of the information requested may or may not have been provided

19  to the Court but not to defense counsel.

20          And I need to be cautious here because the defense

21  does not have authorization to have answers to certain

22  questions in there.  The Court does.  So the --

23     THE COURT: But how would I know?  How would they

24  know which questions they are?

25     MR. TUCKER: They wouldn't, Your Honor.  But I'm

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*



10
&#8212; CONTAINS SEALED CLASSIFIED INFORMATION &#8212;

1   happy to highlight that to the Court outside the presence of

2   defense counsel.

3            THE COURT:  Well that doesn't help me.

4            MR. TUCKER:  Your Honor --

5            THE COURT:  Your point in the other room was that

6   they don't need some of this material in order to make their

7   arguments on sentencing.

8            MR. TUCKER:  Absolutely, Your Honor.

9            THE COURT:  And their position is that sentencing ih

10  this situation is an extension of the process of pretrial and

11  discovery and preparation for trial and material that would be

12  in the nature of Brady material, were there to be a trial, and

13  that it's a more expansive view of Brady than you're willing

14  to agree to.

15           MR. TUCKER:  I agree with that, Your Honor.

16           MR. BACHRACH:  Your Honor, if I may add.

17           THE COURT:  Of course.

18           MR. BACHRACH:  I would actually take it a little bit

19  further than that.

20           THE COURT:  I'm sure you would.

21           MR. BACHRACH:  I would say that since, as I

22  explained in my letter, since Brady is itself a case dealing

23  with penalty phase mitigation for sentencing, which is

24  analogous to sentencing in a noncapital case, since the issue

25  that was found reversible or found to have been the problem

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*
UNCLASSIFIED

11

- CONTAINS SEALED CLASSIFIED INFORMATION -

1   with Brady originally, was the failure to turn over evidence

2   that would mitigate favorably towards the defendant in

3   relationship to what his punishment should be. And that is

4   analogous to what his sentence should be.

5        So Brady is not simply confined to pretrial

6   proceedings, it may be that that's where it's most commonly

7   cited, but it is certainty not what it's confined to. It does

8   apply to sentencing as well. So information relevant to

9   sentencing under 3553(a) or 3661, either one of those, it

10  would be applicable. And from our perspective, Your Honor, I

11  think Brady itself is pretty clear on that point.

12       THE COURT: And the government's position -- just

13  share with me the government's position on what might be a

14  balancing of the equities. I don't know that it would apply

15  in Brady, if Brady is applicable, but how does the government

16  square that concern of the defense and the rights of a

17  defendant to have an appropriate set of arguments for a

18  sentencing with the issue of national security and so forth.

19       MR. TUCKER: Right. Well, I think a couple of

20  important framing points, Your Honor.

21       The first is I think Mr. Bachrach goes far too far

22  in his extension of Brady. If we're talking about Brady from

23  the standpoint of disclosing mitigating details about a

24  defendant, I think that's very different than providing

25  information about consequences or possible outcomes attenuated

12

— CONTAINS SEALED CLASSIFIED INFORMATION —

1  and stemming from a defendant's cooperation. So I simply
2  don't acknowledge, and Mr. Bachrach cites to no case to
3  support the proposition that the defense would be entitled to
4  that information.

5           Now that said, Your Honor, the government has, in
6  good faith, in a manner consistent with the cooperation
7  agreement, has endeavored to provide the Court with any and
8  all details available to it about the nature of the
9  substantial assistance provided by the defendant. And in so
10 doing, we have provided a very small ex parte portion of our
11 classified submissions. And Your Honor knows, as Your Honor's
12 been practicing and on the bench far longer than I have
13 been --

14           THE COURT:  Who has been?

15           MR. TUCKER:  You have, Your Honor.

16           THE COURT:  We had a problem with that yesterday in
17 another matter.

18           MR. ZISSOU:  Yes, we read.

19           MR. TUCKER:  But Your Honor knows that it's a common
20 practice in this district to make ex parte submissions in
21 support of 5K applications, and we've done it here in the
22 unclassified context as well, where we described cases that
23 are pending, where we've charged individuals based on
24 information provided by the defendant in the course of its
25 cooperation. And defense counsel doesn't quibble with that



UNCLASSIFIED

13

- CONTAINS SEALED CLASSIFIED INFORMATION -

1   because they understand that it would be ridiculous to suggest

2   that they would be entitled to know who is charged in an

3   ongoing investigation.

4        It's the same idea, Your Honor.  This is positive

5   information about the defendant.  We made that clear in our

6   footnote.  It's information that the Court should consider in

7   evaluating sentence.  But the Court doesn't need the defense

8   counsel to comment on this information to understand its

9   import.  I apologize, Your Honor.

10        THE COURT:  No, go ahead.  No, you finish.

11        MR. TUCKER:  I would just say:  Only the government,

12   and the law is clear on this, only the government is in a

13   position to assess whether substantial assistance was granted.

14   I mean obviously it's such that it was.

15        But we are the ones who can explain to the Court

16   what the nature of that substantial assistance is, and we've

17   done that.  The information is a incredibly small subset of

18   the information not provided to the defense is simply, Your

19   Honor, so sensitive that the stakeholders would not let us

20   provide it.

21        THE COURT:  Did you want to add something,

22   Mr. Kessler?

23        MR. KESSLER:  No.

24        THE COURT:  No?  Okay, you had your chance.

25        Let me just say, and I'm not sure how far I can go

UNCLASSIFIED

C06682572

UNCLASSIFIED

14

— CONTAINS SEALED CLASSIFIED INFORMATION —

1  in saying this -- well, let me ask this: You heard
2  Mr. Zissou's comments in public just now about the scope and
3  significance of his client's assistance. If I were holding a
4  sentencing proceeding, would you be taking issue with that?
5          MR. TUCKER: As a practical matter, probably not,
6  Your Honor. I think Mr. Zissou will be able to make his
7  full-throated argument in favor of his client, and I think
8  that frankly, Your Honor, the government would be doing the
9  same.
10         THE COURT: Well, would it be inappropriate for me
11  to give, based on having read the material that is the subject
12  of this discussion, at least an overview, not of any of the
13  details, any of the facts, but of the significance that the
14  Court believes that this material would engender at a
15  sentencing proceeding, or is it premature for me to do that?
16         MR. ZISSOU: I certainly don't think it's premature.
17         MR. TUCKER: I don't think it's premature, Your
18  Honor, I think the Court can definitely do that. But the
19  Court knows what's under those redactions.
20         THE COURT: Yes, but the defense doesn't, and
21  obviously the defense has a concern that they have articulated
22  that this might be helpful -- knowing these facts might be
23  extremely helpful in formulating their arguments for a
24  particular proposed sentence, let's say. And I'm not sure
25  whether they're right about -- and I'm not going to comment

UNCLASSIFIED

15

1   today on whether they're right about their Brady argument, but

2   I can understand why in a case as charged, as serious and

3   having as much scrutiny and attention being given to it as

4   this in the environment we live in, that they would want to be

5   able to make the strongest possible argument for their client,

6   who is clearly in a very difficult spot in terms of his

7   existence, having done what he did before and after his

8   arrest. .

9           So the reason I ask the question is, perhaps it's

10  possible to put this whole discussion to rest by the Court, at

11  least giving an overview of its view, its own view of the

12  significance of this information in terms of sentencing, which

13  could put the -- or not put the defense at ease about the

14  significance of this material without providing the material,

15  which I would agree, having read it, is extremely sensitive.

16  So the only way the defense could get it is if they can win on

17  their Brady argument, all right?

18          I trust them to follow the rules about not

19  disclosing information, but I can also understand the reason

20  why the government has redacted these particular short phrases

21  in the submission, in the classified submission.  So that's my

22  question.  I mean is this a problem for the government?

23          MR. TUCKER:  No, I don't think so, Your Honor.

24          THE COURT:  Well, I've read the materials and it's

25  clear to the Court that the redacted material is extremely

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter


UNCLASSIFIED

16

— CONTAINS SEALED CLASSIFIED INFORMATION —

1  helpful to the Court in a very positive way in how it looks at
2  the defendant's cooperation, that this is extremely
3  significant and very positive in any argument that the defense
4  makes in connection with the best possible sentencing results
5  for the defendant.

6      So I don't know how far we want to take this, but
7  everything that Mr. Zissou said reflects what's in this
8  redacted material.  The Court accepts the redacted material as
9  being bona fide and accurate, and also be extremely sensitive,
10 and I don't know that you need any more than that, but you're,
11 Mr. Zissou, Mr. Bachrach, you're the defendant's attorneys, if
12 you want to pursue the arguments that you made in your
13 extensive submission of today, that is your right and I can
14 rule on it, obviously, but you should understand that I think
15 that the materials that are redacted are extremely helpful to
16 your case and the Court -- and actually it was very helpful
17 for you to raise these issues so that I would focus on them.

18     If the idea, among others, was that I should take a
19 special look, I've taken that special look and I'm very
20 impressed by what the government has put forward.  So it's
21 really up to you, and I'm not going to tell you what to do
22 now, you can tell me.  If you want to pursue the application,
23 that is your right and I'll rule on it, but I think it's very
24 clear that there's some very beneficial materials in there for
25 your client.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter


UNCLASSIFIED

17

— CONTAINS SEALED CLASSIFIED INFORMATION —

1    MR. ZISSOU: So, Judge, I think what we'll do is

2  we're going to see the client tomorrow. Again we'll be

3  spending some more quality time with him. We will certainly

4  run this by him. As Your Honor knows, he's eager to proceed,

5  as is the Court and the parties. So we will speak to him. If

6  we think we need anything further, then we will let the Court

7  know, but I think Your Honor should probably think about

8  sentencing and, again, if I'm wrong tomorrow and we decide

9  differently then we'll let Your Honor know forthwith about

10  what the answer might be. Of course we don't have our phones

11  so we can't give you dates. We have to go back into the

12  courtroom to get them.

13    THE COURT: Well, we can do that. We're not far

14  away from the courtroom. But I would like to schedule

15  sentencing, if I could.

16    Is that agreeable to the government?

17    MR. ZISSOU: Of course, yes.

18    MR. TUCKER: Yes.

19    MR. BACHRACH: I'm just going to put this on the

20  record now, if it would be possible to get an expedited review

21  of this sealed transcript for public release, to the extent

22  that it can be, any portions of today's proceedings can be

23  declassified, so that we can rely upon the public submission.

24    THE COURT: Why don't you work that out, if it's

25  possible.

- CONTAINS SEALED CLASSIFIED INFORMATION -

1    MR. TUCKER:  We'll take a look, Your Honor.

2    MR. ZISSOU:  Sure.

3    THE COURT:  I think we're well on our way here and I

4 would very much like to sentence the defendant and move on.

5    MR. BACHRACH:  Understood.

6    THE COURT:  And however I sentence the defendant, he

7 has agreed to continue to cooperate with the government.

8    MR. ZISSOU:  No question.

9    MR. BACHRACH:  Yes, Your Honor.

10    THE COURT:  Let me just ask this, as long as we're

11 sitting in private.  Has the defendant's cooperation continued

12 full throated over these nine years?

13    MR. TUCKER:  Your Honor, I think the answer to that

14 would be nearly, but not entirely, and we addressed this in

15 our letter a little bit.  The hiccup in the cooperation

16 related to his potential testimony in a case that was current

17 in September.

18    THE COURT:  I think you wrote to me.  Is that the

19 one you wrote to me about?

20    MR. TUCKER:  I think I did, Your Honor.  It's in our

21 file.  I think there's a bit of a tension between what I think

22 is Mr. Zissou's accurate characterization of his willingness

23 to cooperate with sort of his state of mind in terms of like

24 whether his mind is ready to be fully cooperative.

25    THE COURT:  Well, there's also -- if he's anxious to

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter
UNCLASSIFIED

19

- CONTAINS SEALED CLASSIFIED INFORMATION -

1   be sentenced.

2          MR. TUCKER:   Right.

3          THE COURT:   If he's sentenced now, does it -- what

4   is your view, rather, of whether that would have any affect on

5   his willingness and ability to cooperate in a proceeding later

6   on.

7          MR. TUCKER:   I'm reluctant to speculate on that.   I

8   would need to speak to Mr. Bachrach.

9          MR. ZISSOU:   It won't undermine it whatsoever.

10

11

12

13

14

15

16                                                              He

17  understands the cooperation agreement obliges him to cooperate

18  fully and he will continue to do so.

19          His concern is the passage of time, because early

20  on, let's call it a misunderstanding, there were, as there

21  often are, suggestions about how long it would be, two years,

22  three years, five years, and before you know it it's almost a

23  decade and that leads to, given the passage of time and where

24  he's been housed, it leads to --

25          THE COURT:   Frustration.



UNCLASSIFIED

20

- CONTAINS SEALED CLASSIFIED INFORMATION -

1          MR. ZISSOU:  Yes.

2          MR. TUCKER:  And distraction I think, Your Honor.

3          THE COURT:  Well that's understandable.  And what

4    you know and I know, but he certainly would never know, is

5    that it is not a unique circumstance to a terrorism case, it

6    has to do with any kind of cooperation of a --

7          MR. ZISSOU:  Sure.

8          THE COURT:  -- serious nature --

9          MR. ZISSOU:  Sure.

10         THE COURT:  -- where there are proceedings that are

11   unearthed over time and --

12         MR. ZISSOU:  Sure.

13         THE COURT:  -- and assistance is needed for a good

14   period of time.

15         MR. ZISSOU:  None of us were here at the time so --

16         THE COURT:  Who wasn't here?

17         MR. BACHRACH:  The attorneys.

18         THE COURT:  Oh, yes, I was here.

19         MR. ZISSOU:  Mr. Tucker, you were here.

20         THE COURT:  I was here.  I was here on day one.

21         MR. ZISSOU:  I wasn't.  All I can tell you --

22         THE COURT:  Well, I was here in my business suit

23   when the prosecutors came in with the defendant and the FBI

24   all wearing flak jackets and helmets when he was arraigned.  I

25   was the only one -- and the court reporter who were basically



21

- CONTAINS SEALED CLASSIFIED INFORMATION -

1  unprotected.

2  MR. ZISSOU: He was certainly somebody who needed to

3  be protected, I'll tell you that. Still does and still will

4  for the rest of his life.

5  THE COURT: But I was here on day one.

6  MR. ZISSOU: Couple of things have combined to make

7  this better. One is Your Honor having regular status

8  conferences. That really helped us. And then I think

9  Mr. Tucker stepped in and directly gave the client a choice:

10  Either you can wait or you can be sentenced, we won't stand in

11  your way, you've done a lot for us, but understand I have to

12  tell the Judge that Mr. Tucker did that, I have no --

13  THE COURT: Right, and that's why we're here now.

14  MR. TUCKER: Exactly.

15  THE COURT: Okay, that's fine. All right.

16  So is there anything else for this sealed

17  proceeding?

18  MR. ZISSOU: Not from the defense, Your Honor.

19  MR. TUCKER: Not from the government, Your Honor.

20  THE COURT: All right, the transcript is sealed, and

21  is there anything about it that needs to be -- anything else I

22  need to say about it?

23  MR. ZISSOU: No, Judge, other than --

24  THE COURT: And maybe made available to the parties,

25  the attorneys of record, only.

22

- CONTAINS SEALED CLASSIFIED INFORMATION -

1      MR. ZISSOU: Your Honor, can I have the reporter

2  prepare the public portion of the transcript?

3      THE COURT: Let me say it.

4      MR. ZISSOU: Thank you, Judge.

5      THE COURT: For review and the possible preparation

6  of a redacted public portion, if it is agreeable to both

7  sides.

8      MR. ZISSOU: And just so we -- insofar as the

9  previous proceeding in open court, would Your Honor order

10 those minutes produced as well?

11     THE COURT: Yes, the minutes of the public

12 proceeding, which took place before this proceeding, will be

13 completed, the transcript will be completed and made available

14 to the parties.

15     MR. ZISSOU: Thank you.

16     MR. BACHRACH: Thank you.

17     THE COURT: All right, so what do we need to go out

18 and do now?

19     MR. ZISSOU: Do you want to just pick a date for the

20 sentence?

21     THE COURT: Let's go out and pick a date for the

22 sentence. All right, you all will get your cell phones back

23 and your iPhones.

24         (Whereupon, the matter was concluded.)

25              *    *    *    *    *

I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.